Here ye, here ye, here ye, this Honorable Appellate Court for the Second Judicial District is now back in session pursuant to adjournment. Thank you, please be seated. The promise is placed on the docket 2-16-0583. In re Marriage of Bernay, Petitioner Appellant in Jerry S. Bernay, responding to Appellate. Appropriating on behalf of the Petitioner Appellant, Mr. Joel S. Castro. Appropriating on behalf of the Respondent of Appellate, Mr. Brian A. Schroeder. Thank you. Mr. Castro, on behalf of the Appellant, you may proceed. Thank you, Your Honor. Honorable Justices, Mr. Schroeder, Mr. Shulman, may it please the Court, I'm Joel S. Castro representing Linda Bernay, the Petitioner Appellant in this case. Michael Haber, esteemed attorney, is lending me some moral support. So to speak. Yes. The efficacy of any determination of a post-judgment maintenance petition depends on the relevancy and accuracy of the findings that purportedly support the ultimate conclusion. And the conclusion to support what happened here would have to be one that no reasonable person would, from which no reasonable person would differ. What had to be established by Mr. Bernay was that there had been a substantial change in circumstances since the 2005 trial and the 2006 appeal in either his ability to pay or the needs of Mrs. Bernay. And it is our position that all of the findings that the Court included regarding Mr. Bernay's ability to pay, his supposed diminishment in income, his desire to retire, what his resources were, should not have been relevant to a conclusion that he no longer had the ability to pay $3,600 a month. What about his diagnosis with lymphoma? Isn't that a substantial change? The guy's got cancer. My response to that would be that nobody would want to have it. His testimony, on the other hand, was that it had not impacted his ability to work and that he had almost minimal contact with his physicians as a result. Was there any testimony regarding his life expectancy? No. And I would also say this. Even if one were to conclude that his desire to retire was legitimate because of the illness, his ability to pay was not diminished as a result of both his inheritance, the assets he had from the original divorce and what he had developed since, the fact that he's remarried to somebody who's able to pay a lot of those household bills in excess of $100,000, and the fact that he actually was still working. He said that even after moving to Florida, he would work. Plus, he was offered $350,000 for his business, payable over two years at $175,000 a year to do some consulting, I think he said. And he turned it down as not enough money. So you're saying, in short, that there was no showing that he was no longer able to pay the maintenance. Is that correct? That's correct. And usually what we look at when we look at maintenance is either the increased or decreased needs of the recipient versus the increased or decreased needs of the payer.  Correct. And so, are you basically saying that notwithstanding the illness, which is very sad, his retirement, which I think he's entitled to because of age and circumstance, that he still, there had been no decreased ability on his part to pay? That's correct. And I do, I said this already in response to Justice Burkett's question, but I would reiterate it in light of Your Honor's comments, which is that he did testify that he'd been able to go on working basically the same hours, despite the illness. And that the medical, I think it was a non-Hodgkin's lymphoma, the, he very resolutely needed to see a doctor or use any medication. Was there any evidence presented about, even though he had infrequent visits with his doctor, any evidence about possible payments or cost of subsequent treatment, which is likely to be needed? Not that I recall from the record. There was no medical testimony whatsoever, and I don't believe that he even testified to what he may have expended on top of whatever insurance cover for the medical treatment he had had thus far. You mentioned his inheritances, which have, some were still possible as this trial was going on because of sale of homes and things of that nature. As a matter of just policy, should non-marital property be factored into this particular situation, or in this case, does it even need to be based upon his own resources? It may not need to be based on his own resources. But there's, case law is rife with saying that non-marital income counts towards computing either maintenance or child support. And case law is also rife with imputing income to assets. And we're talking about several million dollars here, in addition to Mr. Bernays own testimony that he has significant retirement funds. And he testified at this hearing that if Judge Salve ruled that he had to go on paying the maintenance, he would do so, he would still retire, and he wouldn't have to draw on his retirement assets. So, you know, in my mind, that's a very clear admission that there was no substantial change in his ability to pay, be it from the resources that he had engendered on his own, the ones he inherited, his ability to keep working, the fact that he had someone to whom he was married that would be able to defray some of his expenses. What about the child court's finding, based upon the testimony about Lynn's annual gift from her father, and also she has these vacant rooms that she can rent? I would say a few things about that. First of all, I think that it needs to be recalled that in 2005, she lost $2,400 a month in payments. Now, some of that was child support, which was an allocated payment of $6,000 a month. And even though Guy don't have the expenses for the kids anymore, a lot of his expenses remain pretty much the same, regardless. And she didn't make much money in the mid-'30s, I believe. And I think this money that was coming in, and the border money was sporadic, and it wasn't a lot. It was $400 or $500 a month, and the money from her dad, those people lived with her. And, you know, inherently, some of the money that's coming in that way is going to be spent to help defray those people's expenses. And it didn't – you could add up all the money, and it doesn't come close to giving her anywhere near the standard of living of the marriage, which is not only part of the law, but is part of the law in this case. Did her financial needs decrease at all, significantly? Only by force of circumstances. For example, that she didn't have – she had a 13-year-old car because she couldn't make car payments. And she couldn't take vacations unless somebody else helped pay for them. And then part of this, when we discuss her father, is, I think, significant when you compare the equities in this case and the consequences of the two possible decisions that Judge Selvey could have made. Her father is 88 years old. She – I don't know what his life expectancy is anymore than I know Mr. Burnett's, but I can guess it's not too long. And a termination is permanent. She can't come back in now and go, well, my dad died. I'm not getting that $1,000 a month anymore. Whereas permanent maintenance, even when it's ordered to begin with, is a legal word of art, but it's not permanent in any fixed sense like a termination is. And so if – because we're not saying, we've never said that there are no circumstances under which Mr. Burnett could be allowed to stop paying, but it does require substantial change in circumstances. Well, Ryan, didn't the trial court or one of the trial court's principal bases for terminating maintenance was Jerry's claim he's going to retire? What's your reaction to that? Can that be a substantial change? It could be if that was going to reduce our impact on resources to the extent that – from nine years ago to the extent that it impacted your ability to pay $3,600 tax-deductible dollars a month. And his retirement does not do so for a wide variety of reasons, one of which is – and I've mentioned this before – is he could have had $175,000 a year for the next two years of income from his business by selling it to the person who made an offer. And he said it wasn't enough money, so he expects to get more than $350,000 for that alone. And when he himself testifies that I don't need my retirement income to support myself or to be able to pay Lynn Burnett if I'm ordered to do so, I don't see how one can escape from making – from saying that it wasn't – no reasonable person would say that this – Mr. Burnett established an inability to continue to pay. In addition, the court should – I think Mr. Burnett got the court to successfully shift a burden of proof here to Mrs. Burnett that should not have occurred, and that is regarding her health and her ability to be employed. There were definitive findings in 2006, which I think Mrs. Burnett was entitled to rely on, that her health was such that she could not perform the more heavy physical duties of a nurse and that the employment that she had – and she had not been employed during the marriage for 17 years – that the employment – educational employment she had acquired afterwards and then had to sort of downsize her employment due to her physical condition was the best she could be expected to do. In the trial, Mr. Burnett argued that she had a burden of proof what her health was now that she hadn't got all better. And I don't see where that could possibly be so. He's the petitioning party. He's the person that has to prove that there's a substantial change in circumstances in her health. And he produced no medical evidence or no evidence at all that her ability to acquire income was – had improved or that she had sloughed off in some manner or another. She did testify that she rode her bike and that she did yard work, correct? Right. And, you know, I don't see that – It's different than performing the rigorous duties of a nurse. Right. I don't see that rising to the level of moving a 150-pound patient from one bed to another. But – Counsel, you've noted several times as you've talked here that she had the – she should have been able to rely on some of the issues that were raised before Judge Winter. That, you know, she was – she had done her best. She had rehabilitated herself. She had gotten to this point. But then in your brief, you also talk about law of the case. How could those findings be binding as law of the case? Because they end up with, as the law of law of the case says, they wind up with giving the parties subtle expectations and consistency in continuing litigation, which is what a matrimonial case is in every post-judgment proceeding as regards continuing litigation. In this particular instance, the 2005 decision of Judge Winter and the written decision by this court affirming that decision, there are findings that her health had deteriorated to the point where she – this is the job she could do. This is the best she was – work she could have. There was a finding that she would never be able to, on her own, come anywhere close to the marital standard of living. Those are subtle principles here. And she was awarded permanent maintenance. And that's also a subtle principle in this case. The – and what the law of the case does here is on those issues, her health, her ability to meet the marital standard of living, whether the maintenance goes on or not, the burden of proof was on Mr. Burnett to establish that something substantial had changed so that a court could now modify or terminate the obligation that was set in 2006. And none of that occurred. Did Judge Winter in 2005 specifically say, I expect the parties to retire at some point, or did she recognize their ages? And one just looks at that and says, well, mid-50s, mid-60s? My recollection is she didn't comment on that. And I would say this, you know, if you – and I'm not being cavalier in any way, but if you remove the illness that Mr. Burnett has, he's 62 or 63. I don't think courts, you know, in prior years, courts have talked about 65, 66 being a reasonable retirement age. It moves up all the time, as I'm living testimony to. But, you know, to – what if he were 50 and inherited this money and said, you know, I don't have to work anymore, so I'm going to retire, and I'm not going to – I shouldn't have to go unpaid? You know, I think his age does not – it may lead a court to say, well, you're that old and you have this illness, you're entitled to retire, but that doesn't change his ability to pay. If I could have one more minute after a ballot, one other issue that I wanted to discuss was the duration issue. And, you know, there is no case law yet under the new statute about, you know, when guidelines apply and when they don't. It's the Cole case, which said that if the case was tried before the new statute, then we're not going to use the guidelines. So I don't think there's been any appellate court cases about the guidelines. But I would say this. Yes, it is true that Mr. René will be paying for some number of years longer than the length of the marriage. But that, in my opinion, number one, is the only factor in his favor here. And as the Illinois Supreme Court reminded us a few weeks ago, all the factors have to be considered. No one stands alone. Secondly, duration of payments in relation to the length of the marriage has always been a factor. And even in the new statute, it says it's discretionary. It's not rigid. But lastly, I would say this, that under 504B-1, those guidelines only apply when the combined income of the parties is less than $250,000 a year. And Mr. René argued that Mrs. René's income was $74,000 a year. I would take issue with that, but let's assume that's true. And Mr. René testified, I could get $175,000 a year for the next two years, but I'm turning it down. That's $249,000, and he has millions of dollars in assets. So I'm not convinced that the guidelines would apply here anyway. Thank you, Your Honors. And I will defer to Mr. Shorter. All right. Thank you very much, Mr. Estrell. Mr. Shorter, on behalf of the appellate. Good morning, Your Honors. Good morning. I would, if I could, like to start with Justice Hutchinson's question about the law of the case doctrine. Judge Winter explicitly recognized and cited this Court's decision in Congress for the proposition that the prior determination that she was reviewing did not constitute law of the case. That same rationale applies to this review here, which resulted in termination of maintenance. This Court squarely held that law of the case doctrine does not apply to termination proceedings, even if it did, which we don't think it does. In Congress, this Court itself said the law of the case doctrine does not apply if the facts have changed in the intervening time span. And here we submit the facts have, in fact, changed because. The one fact that we were discussing earlier, her health, have the facts really changed? Regarding her health? Regarding her health, or her ability to earn more money. There's no medical evidence in that regard. What we have is her testimony saying that her arthritis prevented her from doing catheterizations, immunizations, and blood draws. That's what she said at trial. She was impeached with her testimony that a week before her deposition, which was only about a month before the trial, she had performed a vaccination, which is an injection. And she was also impeached with her deposition testimony that when she was appalled, she said the only thing that her arthritis prevented her from doing was blood draws. So as the trial board found her credibility on that issue was suspect, and the judge, in fact, chose to disregard her testimony, that her ability to work was severely limited. So that is the evidence we have, Your Honor. Something that has changed in the intervening time span, though, between Judge Winter's ruling and this ruling here was, first of all, Lynn was receiving $12,000 in annual gifts from her father. Secondly, she had been receiving rent for several years in that time span. And thirdly, and what we think is very important as well, is that since about June of 2012, she was, as the trial court found, she was deliberately underemployed. She took a leave of absence to care for her terminally ill mother, which, of course, we have no trouble with at all. But what we do take issue with is when she returned from that leave about six weeks after going on it, she could only work part-time because her employer did not have any more full-time position for her. And as she freely admitted in her testimony, she didn't do literally anything to find full-time employment or to supplement her income. She didn't go to job fairs. She didn't apply online. She didn't do anything. She didn't apply for a single job anywhere. So those, we think, all constitute change in circumstances, a change in her needs. She was getting extra income, and then she lost income when she went from full to part-time but did nothing to try and supplement her income or find full-time employment anywhere, whether it be in Boulder itself, where she lived, or in Denver. She didn't look anywhere. But what authority does a court have to say to a woman or a man who has gone through a rehabilitative process, which was after the divorce when she went and got the degree, that now that you are 60-some years old, you shall go back and get to school so you can get a better job, and you shall rent your house out to strangers on a regular basis so you can meet your needs? What's the court's authority to do that? There's no per se authority for those two things. Then how can it happen? What the authority is is those are part of the totality of factors under the 510 analysis that the court is to conduct. Her income, her ability to generate income, the fact that she has a house that's a five-bedroom house which she was renting to friends, and she wasn't renting to strangers. She was renting to friends. They were renting to people that were essentially co-workers that were in need, correct? Yes. That's what Lynn's testimony was. So you're not suggesting that because she has the ability to turn her house into a rooming house that that's a substantial change in circumstances, are you? I mean, that's a ridiculous argument. I'm not saying she has to turn her house into a boarding house. The trial court essentially found that she has these rooms she could rent. She could make this additional income. That wasn't the only thing the trial court found. The $12,000 gift a year, the man's 88 years old. So both of those things would be at best temporary, right? Certainly, no one lives forever. But Lynn also testified that she— Why not modify as opposed to terminate? Because under the facts of this case, again, looking at the totality of them, a maintenance payment for four years going on five longer than they were married under circumstances where she chose to be underemployed. I'm not saying she has to work to the bone until she's 88 herself. But at 62, which is, I think, a reasonable frame for anyone to work, barring extenuating circumstances such as non-Hodgkin's lymphoma or something else, she chose to be underemployed. As the Murphy court said, which we cite in their brief, one person is not relieved of the obligation to become self-supporting just because the payor is a wealthy person. And at bottom, that's what the argument was that Lynn presented below, and that's what she's saying here, too, is because he can't afford to pay her, he should. She was under the cloud of rehabilitation over 10 years ago. She did that. And at that time, she had to use money that she was being paid for maintenance to pay for her education as well as take care of her children. What? In 2005 and then in 2006, Judge Winter said, you know, you've done what you can do. It may not be law of the case. And then we said we believe Judge Winter was correct. She had some right to rely on that. So does that mean that she's not under that cloud? Judge Winter said you've done what you can do. Now, Judge Sallie says you go back to school, you take your Social Security now, and you rent your house out. What authority is there for that under maintenance or anything that applies to this type of a case? I will come back to what I said earlier, and that is in 2012, she became a part-time employee. Because there was no full-time employee there, and Judge Winter had said she doesn't have to go back and get more education. She's come as far as she can go. At the time when Judge Winter ruled and this court affirmed that Lynn was working full-time, she then went to part-time and did nothing about it. That's the issue here. If you want to say, and obviously you are, Justice Hutchinson, that she had some sort of expectancy or settled interest in relying upon the fact that Judge Winter had said you've done all you can do, that was when she was working full-time. She no longer is. There was no court blessing her staying underemployed and not trying to get back to a full-time employment situation in 2012. How did Judge Sallie arrive at a full-time figure when I don't think there's any evidence of what she could have earned that before, but now the nursing business is ebb and flow based upon disease and other things. What evidence did you present because it was your burden that she could make more money as a full-time employee today or at the date? There was no evidence presented as to what she could have done. The evidence that was presented was she did nothing to find any other employment. And that makes her a poor person? No, it makes her in our judgment. A person who shouldn't have enough support to maintain her standard of living? Someone who chose to remain to be deliberately underemployed. At a time also, she admitted that she was making gifts. She said that she bought a plane ticket for one of her friends that was living with her. And you've alleged that she misused her maintenance. Any authority for that? Pardon me, Your Honor? You've alleged she misused her maintenance. Yes, as we said. Where is the authority that you misused your maintenance? As Judge Sallie found, by buying a plane ticket for a friend of hers, by making some gifts to her friends, by paying for her adult daughter's cell phone bills, by buying a plane ticket for her adult daughters who she testified to were adults and self-sufficient and had the money themselves. That's misuse of her maintenance money. She doesn't need to do that. And it's inconsistent to do that and then come to try and defend Gary's petition and say, well, I don't have any money. Let me just ask you, if you don't object to the question, you're going back and forth. The questions in the dialogue indicate sort of a subtle tension between perhaps two competing propositions of law. The authority that says a spouse awarded indefinite maintenance is a good-faith effort to become self-sufficient and accept appropriate employment. On the other hand, there's a legal proposition that says a former spouse is not required to lower their standard of living established in a marriage as long as the payor's spouse has sufficient assets to meet his needs and the needs of the former spouse. And you alluded to that in the phrase when you said, her position is he can pay it so we should pay it. But recognizing that latter proposition, how do you respond to the argument that a spouse does have sufficient assets to meet his needs and her needs? That is but one of the factors in Section 510. And as we said in our brief, there's no case and certainly nothing in 510 itself that says if you can pay, you must pay. I mean, if it was that simple, if a gentleman, somebody wanted that to be the rule, then they wouldn't have, you know, between Section 510 and 505, there wouldn't be over 15 factors that the courts would consider in a maintenance review proceeding. They would just say it would be another subsection in 510. If the payor has the financial needs to pay, then maintenance is permanent. That's not there. So it's not a per se rule. Let's shift gears a little bit. Let's talk about the test, which is the critical issue, substantial change. In circumstances, when the permanent maintenance was awarded in 2006, the parties were in their mid-50s, I believe, according to the record. That sounds about right, yes. Was the issue of year of retirement really in the distant future? Wasn't it sort of around the corner? So can they make the argument there's really no substantial change because retirement was contemplated in the national distribution? How do you respond to that? I respond to that by saying, first of all, the Judge Winter's ruling and this Court's decision really was essentially silent on the topic of retirement. And, of course, none of us are idiots. We all know that when you're in the 50s, retirement is in the hopefully not too distant future. But it wasn't explicitly addressed. The fact that Jerry did contract non-Hodgkin's lymphoma, and as he testified, it did affect him. He became tired easily, more easily. He was lethargic. It is not like he has something and it's asymptomatic. It does affect his life. But what Jerry also testified to was that in the period from, I think, like 2006 to 2009, his average income then was $250,000, and it went to $128,000 in the years of 2013 and 2014. That's on page 192 of the trial record. There wasn't change. His income dropped significantly, almost by half. He filed the petition to terminate in July of 2014. His mother died in September of 2014. His father died in early 2015. He didn't have that money, and he wasn't expecting it. There was no evidence that he knew his parents were going to die or that he knew he was going to inherit a whole lot of money from them. The circumstances that changed were that his income dropped. The circumstances that changed, again, going back to what I was saying to Justice Hutchinson, is that Lynn was getting gifts for her father. She was getting other income, and her income dropped for the fact that she was only working part-time. The Shen case that we cite in our brief says, the needs of the payer's spouse must change or the needs of the recipient must change. These are changes. It doesn't say they have to go up. The recipient's needs have to go up. It just says they have to change. These are the changes. So that would be my answer is it's not. They did contemplate retirement, I'm sure, the abstract. But again, when Judge Winter ruled, Jerry was making $250,000 a year from his business. That was cut in half at the time he filed for the determination of maintenance. That certainly, I think, would respectfully submit as a change in circumstances, regardless of whether you want to consider what happened on Lynn's side of the equation, so to speak. Would you agree there's still a fairly significant disparity between the two in terms of income and assets? Of course, right. If you use a word you used earlier, it would be ridiculous for me to say otherwise. Right. So, you know, the trial court, as opposed to modifying maintenance, looking at all the factors that you just mentioned, pulls the rug out from under Lynn and says it's terminated. That's what the trial court did. I would disagree with your characterization. It terminated maintenance. And then Judge said, you know, I read his findings. She performs yard work and she can ride a bicycle. So therefore, her testimony that her skills as a nurse have diminished because of her arthritis is not credible. You can also look at it, and I don't think that Judge Santi put this explicitly in his ruling, but you can look at, as I said before, her testimony about what she can do at work. About Santi or Salvi. Santi was earlier. Sorry, I made that mistake, and I apologize for that. The testimony, again, was she said I have difficulty doing catheterizations, injections, and blood draws. And that was impeached again when she said I performed a vaccination a week before my deposition and was impeached further when she said, oh, yeah, in my deposition, I said it only impacted my ability to do blood draws. So when you look at the totality of the evidence, that also impeaches her testimony and diminishes the veracity of Lynn's testimony that she was unable to do her job anymore, apart from the yard work. Well, the fact that she can't do or perform a certain behavior doesn't mean that her ability to do that is not diminished. I mean, if you look at athletes, they shouldn't be on the floor anymore, but they're still playing. Their skills have clearly diminished. They should probably retire. And we can take judicial notice of that. Plenty of athletes overstayed their welcome, yes. But also Lynn testified when she was questioned at trial about that issue and she was asked have you ever had people complain about your performance or you've been written up or anything along those lines about the fact that you can't do your job anymore or your performance is slipping. She said no. I don't have the cite for that, but I remember that. I remember reading that in the trial testimony.  She was still capable of doing her job, and there's plenty of people in their 70s that can do a lot of things. Doctors can still sometimes do things at 70. I hope to be able to do this when I'm 70. So the mere fact that she's 62 and has arthritis doesn't in and of itself per se mean she can't do her job anymore. And I think if you look, I guess I'll summarize. Again, the standard of review here is user discretion. Could no reasonable person agree with the decision to terminate maintenance here? Based upon the totality of the evidence, we submit that this was within the court's discretion, and if I may for no more than 20 more seconds, the question when you evaluate the trial court's decision is not would you have ruled differently. The question is can it be said that no reasonable person would agree with the trial court, and we submit that a reasonable person can, in fact, and would agree, and therefore we believe the decision should be affirmed. Thank you very much. Thank you. Thank you very much, Mr. Schroeder. Rostow, you may respond. Thank you. What about that abusive discretion? It is a fairly high hurdle, isn't it? We haven't talked about that. Of course it is. But the definition of it is, just what Mr. Schroeder said, and I think I said it earlier, is that no reasonable person would agree with the decision that the trial court had made, and I think that we've crossed that threshold because addressing things that Mr. Schroeder and Judge Hutchinson in particular asked about and discussed, Mr. Schroeder said, well, he proved his income went down by one-half from his business. Let's assume that to be the case, even though he could make, as I said, $350 over the next, he could have made $350 over the next two years if he wanted to, but turned it down. The current maintenance statute says the same thing the child support statute says, which is that maintenance, the ability to pay, is measured by income from all sources, not simply from your employment. And Mr. Burnett has many resources which he could have for income, investment, retirement funds, his own Social Security, and so there has been no substantial change in his ability to pay. That's our position, and I think that's a conclusion from which no reasonable person could differ, including Mr. Burnett. He said, I can pay this. I can pay this and not take my retirement funds. And so I think that trying to maintain that there's been a substantial change in his ability to pay is fanciful. With regard to Mrs. Burnett's income, I think what counsel is avoiding here is that what Justice Hutchinson brought up in particular, I believe, which is that she does not, no matter if she could work a little more or not, move a patient around or not, she comes nowhere close to being able to meet the standard of living of the marriage. They pay her $74,000 a year, which includes Social Security, which she would not get if she took it and be subtracted from her income anyway. And that's with her borders. That's with her father's money. She has one asset of significance, that's the equity in her home. It isn't all that much money. She's broke, and she gets no more maintenance. She can't work anymore in three or four years, just like Mr. Burnett. She has no retirement funds to speak of. She never had the real ability to acquire any. And within five or six years after she can't work anymore, she's broke. And that is, in my opinion, a result that's easily foreseeable, and no reasonable person would have imposed that upon this person given her circumstances. As far as what she has chosen to spend money on, I agree with Justice Hutchison's questions on that as well. Every once in a while, some bill is proposed in the legislature, make the recipient account for how they spend this money, and it's always defeated. If this is not maintenance, it is to provide somebody with a certain level of security and dignity. It's not indentured servitude. And if she chose not to go out to dinner so she could do something nice for her daughter, that's still her privilege. Thank you. Thank you, Mr. Constable. All right, I do want to thank both counsel for the quality of their arguments here this morning. The matter will, of course, be taken under advisement. A written decision will issue in due course. We stand adjourned for the day subject to call.